UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CASE NO. 8:08-cv-00838-EAK-EAJ

BRIAN ROCK,

      Plaintiff,

v.

SUNBELT CRANES, CONSTRUCTION
 & HAULING, INC.,

      Defendant.

_____/

### DEFENDANT'S PROPOSED FINDINGS OF FACT
### AND CONCLUSIONS OF LAW

      SUNBELT CRANES, CONSTRUCTION & HAULING, INC. (hereinafter referred to as the "Defendant"), by and through its undersigned counsel, hereby submits its Proposed Findings of Fact and Conclusions of Law, and states in support thereof as follows:

PROPOSED FINDINGS OF FACT

      Due to the fact-intensive nature of exemption from overtime cases such as the one *sub judice*, a thorough review of the testimony presented is necessary before reaching the legal conclusions.

**BRIAN ROCK**

1. The Plaintiff testified on his own behalf. Plaintiff began working for Sunbelt Cranes in May 1999. (VI, P.17, L.10. See also VI, P. 45, L. 9-11.)

2. Plaintiff's first position with Sunbelt Cranes was painting barges. (VI, P. 81, L. 21.) He was paid hourly. (VI, P. 70, L. 24-25.)

3. When Plaintiff worked overtime before becoming a dispatcher, he received overtime pay from Sunbelt Cranes. (VI, P. 80, L. 16-19.) See also VI, P. 93, L. 7-9.

**4.** Plaintiff was interviewed by Jeff Fulton. (VI, P. 81, L. 24 – P. 82, L. 4.) Plaintiff was also hired by Jeff Fulton. (VI, P. 84, L. 4-5, and L. 15-16. See also VI, P. 84, L. 23-25.)

5. When Plaintiff painted barges, he reported to Jeff Fulton, who was a dispatcher. (VI, P. 83, L. 5-11.) The dispatcher would assign the barges that needed to be painted. (VI, P. 86, L. 3-5.) See also VI, P. 189, L. 19-21.

6. Plaintiff did not question Mr. Fulton's authority as a dispatcher in hiring Plaintiff. (VI, P. 84, L. 21-25. See also VI, P. 189, L. 16-18.)

7. When Plaintiff was a rigger, he received instructions from the dispatchers. (VI, P. 189, L. 22 – P. 190, L. 5.)

8. Plaintiff was aware during his employment at Sunbelt Cranes that some positions were hourly and others were salary. (VI, P. 71, L. 7-12.)

9. Plaintiff became a dispatcher approximately one and a half years prior to Ray Anthony, International taking over. (VI, P. 17, L.24-25.)

10. As a dispatcher Plaintiff worked from a desk. (VI, P. 19, L. 18.) He worked in an air-conditioned office. (VII, P. 38, L. 3-6.) He admitted that being in air-conditioning was a benefit. (VII, P. 39, L. 3-6.)

11. Plaintiff did not have a problem with receiving a salary for his position as a dispatcher. (VI, P. 79, L. 24 – P. 80, L. 10.) Plaintiff recognized that when he accepted a salary position that he would not be receiving overtime. (VI, P. 80, L. 16-19. See also VII, P. 45, L. 18-23.)

12. Plaintiff earned more as a salaried dispatcher than he did as an hourly rigger. (VI, P. 97, L. 16-17.) As to the salary of $55,000, he "…was all right (sic) with it." He did not attempt to negotiate a higher salary. (VI, P. 108, L. 10-19.) He thought it was fair compensation. (VI, P. 114, L. 2-5.)

13. Plaintiff became a dispatcher when the former dispatcher left and he was asked to fill in. (VI, P. 99, L. 14-17.)

14. Plaintiff testified that when he became a dispatcher, he only received about one day of training. (VII, P. 52, L. 5-12.)

## DISPATCHER DUTIES

15. Plaintiff agrees that the duties of a dispatcher are such that they could not be performed on only a part-time basis. (VI, P. 123, L. 8-12.) He was working the same hours as other dispatchers worked. (VI, P. 123, L. 21-23.)

16. The routes for the cranes to the job sites are not predetermined. (VI, P. 137, L. 13-16.) See also VI, P. 138, L. 9-14, and P. 140, L. 11-13.

## Hours Plaintiff Worked

17. As dispatcher for Sunbelt Cranes Plaintiff testified he worked from 6:30 in the morning until 5:00 P.M., Mondays through Friday. (VI, P. 18, L.6-9. See also VI, P. 39, L. 11-20; VI. P. 40, L. 12-14; VII, P. 41, L. 8-11; VII, P. 49, L. 8-13.)

18. The Joint Pretrial Statement list the hours as 6:30 A.M. to 5:30 P.M. Their damages calculation must be off by 2.5 hours per week.

19. When Ray Anthony, International, took over Sunbelt Cranes, the Plaintiff's hours changed to 6:30 A.M. to 6:00 P.M., Monday through Friday, and 7:00 to 3:30

every Saturday.  (VI, P. 18, L. 12-16.)  See also VI, P. 41, L. 13-20; VII, P. 49, L. 19-21.

20. When Plaintiff was hired as a dispatcher he was advised what the hours would be. (VI, P. 81, L. 12-16.)  See also VI, P. 104, L. 10-12.  He did not object to those hours of employment.  (VI, P. 104, L. 13-15.)

## Customer Communication

21. If a customer called in about a crane, the call was sent to the dispatcher.  (VI, P. 131, L. 22-25.)

22. Plaintiff testified that he received complaints from customers.  He would take down the information and give it to the general manager.  (VI, P. 168, L, 14-19.) Plaintiff admitted that for some customer complaints, he would not go to the general manager.  (VI, P. 171, L. 4 and L. 13-16.)  Plaintiff admitted that customer communication was an important part of Sunbelt Crane's business. (VII, P. 6, 18-21.)

## Selecting Cranes and Charting

23. Plaintiff testified that when a call came in for a crane from the size of a boom truck to a 70-ton hydraulic truck crane, he would look it up in a chart, considering the weight, radius, and obstructions.  (VI, P. 21, L. 8-15.)

24. When a call came in for a crane larger than 70 tons, Plaintiff testified that he would give the information to a salesman. (VI, P. 21, L. 23 – P. 22, L. 4.) See also VII, P. 9, L. 12-15.

25. Plaintiff testified that he did not have any involvement with bare rentals. (VII, P. 22, L. 10-13.)

26. Defendant's Exhibit 9 is a letter dated September 15, 2006, providing pricing on a 90 ton crane. That letter is signed by the Defendant. (VII, P. 9, L. 17-22.) Plaintiff had no reason to dispute the accuracy of the exhibit. (VII, P. 10, L. 12-14.)

27. Defendant's Exhibit 10 is a written quote on a 150 ton crane that was signed by the Plaintiff. (VII, P. 21, L. 11-16.)

28. Defendant's Exhibit 11 is a bare equipment lease singed by the Plaintiff on behalf of Sunbelt Cranes. (VII, P. 24, L. 13-24.)

29. Plaintiff admitted that he was authorized to sign a bare equipment lease on behalf of Sunbelt Cranes. (VII, P. 25, L. 12-21.)

30. When a customer would call, Plaintiff would ask questions to determine the proper crane. These included how much weight was to be lifted, the radius from where the crane can set to the center of the piece being lifted, whether there were any obstructions, and whether the groundwork was good. (VI, P. 23, L. 6-12.)

31. Sunbelt Cranes maintained approximately 50 different models of cranes. (VI, P. 57, L. 22 – P. 58, L. 1.) Although there were not 50 models in the Tampa yard. (VI, P. 61, L. 13.)

32. Each crane has its own chart. (VI, P. 24, L. 21-23.) The charts that Plaintiff used had 10 to 15 pages each. (VI, P. 59, L. 23-25, and P. 60, L. 3-8.) The chart book had no more than seven charts. (VI, P. 61, L. 25 – P. 62, L. 2.)

33. There are several types of cranes that can perform the same job. (VI, p. 62, L. 19-22.) See also VI, P. 64, L. 12-15.

34. A larger crane can do the job of a smaller crane. (VI, P. 65, L. 3-4.)

35. The company policy was to charge the price for the crane that would do the job. (VI, P. 65, L. 8-10.)

36. The Plaintiff would take information from the customer, look at the charts, and decide which crane to dispatch. (VI, P. 64, L. 18-22.) See also VI, P. 62, L. 23 – P. 63, L. 7.

37. Plaintiff's knowledge of cranes, gained while working as a rigger, helped him perform his duties as a dispatcher. (VI, P. 95, L. 4-12.)

38. Plaintiff's experience helped him know what information to request from customers when selecting a crane for a job. (VI, P. 96, L. 17-24.)

39. The Plaintiff would discuss the condition of the job site with the customer is determining the type of crane to send. (VI, P. 140, L. 14-21.)

40. The Plaintiff would question the customer about power lines at the job site, including the voltage. The voltage in the lines is a factor in how close the cranes can come to the power lines. (VI, P. 142, L. 13-21, and L. 24-25.)

41. The closeness and height of the building at the site are factors that the dispatcher takes into consideration. (VI, P. 143, L. 13-24.) The location and closeness of the building is information that is not in the charts. (VI, P. 146, L. 13-21.) The Plaintiff's understanding of the importance in locating the buildings comes from his knowledge of how cranes operate. (VI, P. 146, L. 10-12, see also P. 146 L. 22 – P. 147, L. 2.)

42. The location of curbs is another factor that the dispatcher must take into consideration in selecting cranes. (VI, P. 144, L. 5-9.) The location of curbing is not something that can be found by looking in the charts. (VI, P. 145, L. 14-16, see also VI, P. 146, L. 1-3.) The location of curbing may require using a larger crane. (VI, P. 145, L. 18-21.) The Plaintiff's ability to recognize the issue with curbing comes from his knowledge of crane operations. (VI, P. 145, L. 22-24.)

43. Plaintiff admitted that the selection of the appropriate crane for a client was an important part of Sunbelt Crane's business. (VII, P. 6, L. 22 – P. 7, L. 1.)

## Assigning Operators

44. Plaintiff testified that most of the cranes had operators assigned to them. (VI, P. 29, L. 1-5, and L. 9.) There were occasions when a suitable and available crane did not have an operator. (VI, P. 156, L. 19-23.) When a crane did not have an assigned operator, and in that case Plaintiff would be responsible for assigning the operator. (VI, P. 29, L. 12-15, and L. 20-25.)

45. Plaintiff testified that when he assigned a crane, he did it based solely on seniority, and no other considerations. (VI, P. 29, L. 21-25, and P. 30, L. 1-5. See also VI, P. 157, L. 1-8.)

## Overseeing Other Employees

46. Plaintiff testified that when operators were finished with their jobs, they would call him in his position as dispatcher. (VI, P. 161, L. 17-20.) See also VI, P. 163, L. 3-5. Plaintiff also received calls from operators when they were broken down. (VI, P. 162, L. 3-7.) If a crane broke down it was then his responsibility to find a replacement. (VI, P. 162, L. 20-23.)

47. The dispatcher would determine what rigging equipment was needed on the jobs for which he dealt with the customer. (VI, P. 100, L. 18-21.) The dispatcher would communicate with the riggers regarding the need to take equipment. (VI, P. 177, L. 2-4.)

48. The dispatcher would communicate with the oilers to advise them where they were going, the oilers would listen to the dispatcher, and do what he told them to do. They would follow the dispatcher's instructions. (VI, p. 177, L. 5-17.)

## Pricing Authority

49. The Plaintiff testified that the small cranes are all set fees, and for the larger cranes pricing is done by the salesman. (VI, P. 26, L. 13-18.) Each crane had its own price. (VI, P. 66, L. 12.) Plaintiff testified that he had no authority to negotiate prices with customers and never did so. (VI, P. 2, L. 5-9.)

50. The job tickets tell the operator where to go and what to do.  The operators must comply with what is listed on the job ticket.  (VI, P. 167, L. 7-15.  See also VII, P. 7, L. 14-17.)

51. The dispatcher handled all of the job tickets.  (VI, P. 173, L. 15-17.)

52. The job tickets showed the number of hours that an operator was at the job site. (VI, P. 163, L. 9-11.)  Operators turned their job tickets into the Plaintiff.  (VI, P. 163, L. 6-8.)

53. The job tickets are also used for billing the customers.  (VI, P. 173, L. 18-20.)

54. The Plaintiff admitted that the preparation of the job tickets is an important part of Sunbelt Crane's business.  (VII, P. 7, L. 18-21.)

Schedule

55. The dispatcher is responsible for maintaining the schedule.  (VI, P. 174, L. 13-15.)

56. The schedule shows all the daily jobs for all of the operators and all of the crane equipment. (VI, P. 174, L. 8-12.)

57. The Plaintiff admitted that maintaining the schedule is an important function of the dispatcher's job. (VII, P. 8, L. 17-19.) The Plaintiff testified that the crane company could not operate without the schedule. (VI, p. 174, L. 18-20.) See also VII, P. 8, L. 20-22.

## Substituting and Calling for Cranes

58. If the size crane required for a job were not available, the dispatcher could send a larger crane. (VI, P. 153, L. 18-21.)

59. The company policy was to charge the price for the crane that would do the job. (VI, P. 65, L. 8-10.) As dispatcher he did not charge for bigger crane if the job did not require the bigger crane, but he also did not tell the customer that he could not send a crane and lose the job. (VI, P. 152, L. 11-15.)

60. Plaintiff testified that if a crane was not available in the Tampa branch, the Plaintiff would call another branch to find an available crane for the size needed. (VI, P. 58, L. 19-25.) See also VI, P. 59, L. 13-16. See also VI, P. 136, L. 8-12.) See also VI, P. 154, L. 23 – P. 155, L. 6.

61. There were times that he needed to find another crane for a job because other cranes were out on other jobs. (VI, P. 126, L. 9-13.)

## Evaluating Other Employees

62. Plaintiff denied having any involvement in the preparation of performance evaluations of the operator, or being involved in evaluating their performance in any way. (VI, P. 32, L. 17-24.)

## Hiring/Firing Authority

63. Plaintiff denied that he was involved in the hiring and firing operators. (VI, P. 30, L. 11.)

64. Plaintiff denied that he had any involvement in either disciplining or recommending discipline for operators. (VI, P. 30, L. 14-19.)

65. Plaintiff denied that he had any involvement in resolving grievances from operators. (VI, P. 30, L. 24, - P. 31, L. 2.)

66. Plaintiff testified that he was interviewed by Jeff Fulton. (VI, P. 81, L. 24 – P. 82, L. 4.) Plaintiff was also hired by Jeff Fulton. (VI, P. 84, L. 4-5, and L. 15-16.) See also VI, P. 84, L. 23-25.

67. When Plaintiff painted barges, he reported to Jeff Fulton. (VI, P. 83, L. 5-11.)

68. Plaintiff did not question Mr. Fulton's authority as a dispatcher to hire Plaintiff. (VI, P. 84, L. 21-25.) See also VI, P. 85, L. 1-4. See also VI, P. 189, L. 16-18.

<u>Current Employment</u>

69. Plaintiff resigned from Sunbelt Cranes on March 14, 2008. (VI, P. 181, L. 23-25.) Approximately two or three weeks after he left Sunbelt Cranes, he started working for All Crane. (VI, P. 182, L. 1-9.)

70. Plaintiff was hired at All Crane by Mitch McDonald, who previously had promoted Plaintiff to dispatcher at Sunbelt Crane. (VI, P. 182, L. 16-23.)

71. Plaintiff was hired to work in the yard at All Crane, not as a dispatcher. (VI, P. 183, L. 11-15.)

72. Plaintiff is earning less working in the yard for All Crane than he did while working as a dispatcher at Sunbelt Crane. (VI, P. 183, L. 21-22.) However,

Plaintiff testified that he did not even know how much he was earning at All Crane. (VI, P. 183, L. 24 – P. 184, L. 4.)

73. Plaintiff admitted that all the dispatchers at All Crane also work more than forty (40) hours per week. (VI, P. 188, L. 19-23.)

## Mitch McDonald

74. Mitch McDonald was called as a witness by the Plaintiff. He was previously employed by Sunbelt Cranes as an operator, a rigging supervisor, general manager and vice president. (VII, p. 61, L. 2-8.)

75. The Plaintiff worked for Mr. McDonald when Mr. McDonald was the rigging supervisor. (VII, P. 63, L. 18-19.)

76. Contrary to the Plaintiff's testimony, Mr. McDonald testified that Jeff Fulton was a vice president, not a dispatcher. (VII, P. 62, L. 21.)

77. Mr. McDonald testified that he and Vic Granowicz, who was vice-president, decided Mr. Rock's salary as a dispatcher, and that it would be salary as opposed to hourly. (VII, P. 65, L. 6-12.)

78. Under cross-examination, Mr. McDonald admitted that Sunbelt Cranes had to offer competitive compensation packages to recruit and retain employees, and that the Sunbelt Cranes compensation was in line with other crane companies. (VII, P. 78, L. 3-7.)

79. Mr. McDonald testified that the duties of the dispatcher included taking telephone calls, taking orders from salesmen, scheduling workers for jobs, and filling out the job tickets. (VII, P. 66, L. 10-14.)

80. Mr. McDonald agreed that the dispatch and the taxi crane fleet is the heart of any crane company. (VII, P. 91, L. 1-3.)

81. When the Plaintiff was promoted to dispatcher, Mr. McDonald informed the Plaintiff that his salary was going to be $55,000 per year. (VII, P. 92, L. 21-24.) The Plaintiff did not ask for more money for the hours over 40. (VII, P. 95, L. 23 – P. 96, L. 2.)

82. Ray Anthony, nor any of his people, were involved in the decision to pay the Plaintiff $55,000 per year. (VII, P. 93, L. 22-24.) That salary was decided by Mr. McDonald and the President of Sunbelt Cranes. (VII, P. 129, L. 23 – P. 130, L. 1.)

83. Mr. McDonald testified that the salary positions at Sunbelt Cranes included year end bonuses. (VII, P. 94, L. 6-12.) There could also be mid-year bonuses. (VII, P. 94, L. 14-15.) He discussed the fact that there would be bonuses with the Plaintiff. (VII, P. 129, L. 20-22.) The bonuses were decided by Mr. McDonald and the President of Sunbelt Cranes. (VII, P. 130, L. 2-5.) Only salaried employees received bonuses. (VII, P. 130, L. 21-23.)

84. The amount paid to the Plaintiff was in line with what other crane companies were paying starting dispatchers. (VII, P. 97, L. 8-13.)

85. Mr. McDonald testified that the Plaintiff did not work as a temporary dispatcher before being promoted to dispatcher. (VII, P. 90, L. 9-18.)

86. Mr. McDonald testified that he spent a lot of time with the Plaintiff, teaching him to read charts and determine which crane to use for a job. (VII, P. 90, L. 15-18.)

<u>Hours</u>

**87. Mitch McDonald testified that the Plaintiff's hours as a dispatcher were Monday through Friday, 7:00 until 5:00 or sometimes 5:30. (VII, P. 65, L. 16-17.)**

<u>Customer Communication</u>

88. Mr. McDonald testified that if there were a customer complaint, that the call would go to the dispatcher. (VII, P. 72, L. 5-9. See also VII, P. 101, L. 8-11.)

89. Mr. McDonald also admitted that the first point of contact for new customers was through the dispatcher. (VII, P. 79, L. 7-13. See also VII, P. 80, L. 3-6.) He further admitted that communication with the customers was critical to the company. (VII, P. 79, L. 17-20.) The Plaintiff would have both initial contact and follow-up communication with customers. (VII, P. 101, L. 12-16.)

## Selecting Cranes and Charting

90. Mr. McDonald testified that the Plaintiff could take care of customers who needed cranes in the 40 to 60 ton range. (VII, P. 73, L. 18-22.) However, for cranes that needed counterweights, that Mr. McDonald would give the freight prices for those jobs. (VII, P. 74, L. 2-5.)

91. The dispatcher may make the determination when speaking to the customer, that the customer's needs exceed the range of cranes that the dispatcher may quote, in which case he refers it to the salesman. (VII, P. 81, L. 13-18.) The ability to recognize these jobs is based on the dispatcher's experience. (VII, P. 81, L. 19-23.)

92. Mr. McDonald admitted that there are some factors in selecting a crane for a job that are not on the chart. This would be the on-site conditions. (VII, P. 102, L. 1-5.) Plaintiff had to ask questions of the customer to determine these conditions. (VII, P. 102, L. 11-15.) Knowledge of the subject was necessary to ask the right questions. (VII, P. 102, L. 20-23.) The Plaintiff's knowledge was the reason he was promoted to dispatcher. (VII, P. 121, L. 17-25.)

93. Mr. McDonald admitted that the dispatcher's responsibility in selecting the correct crane for the customer is an important function. (VII, P. 80, L. 7-11.)

## Assigning Operators

94. Mr. McDonald testified that the dispatcher would be involved in the scheduling of the operators, make sure that they had the right equipment for the job, such as he rigging and spreader bars. (VII, P. 67, L. 6-11.)

## Overseeing Other Employees

95. Mr. McDonald testified that the dispatcher directs the operators. (VII, P. 82, L. 10-13.) The dispatcher uses the job ticket to direct the operators. (VII, P. 82, L. 16-23.)

96. Mr. McDonald testified that the dispatcher was involved in the employee complaints.  If an employee had a complaint, the dispatcher would take the complaint and then pass it on to Mr. McDonald.  (VII, P. 67, L. 15-17, and L. 20-24.)

97. Mitch McDonald testified that it was the dispatcher's job to be sure that the operators have the right rigging and spreader bars for the job.  (VII, P. 67, L. 8-11.)

## Job Tickets

98. When the job tickets are turned in by the operators, the dispatcher is responsible for reviewing the ticket to determine if all the necessary information is on the job ticket.  (VII, P. 84, L. 1-8.)  After the dispatcher reviews the job tickets, they are forwarded to the billing department.  (VII, P. 84, L. 9-12.)  Mr. McDonald admitted that the accuracy of the job tickets is critical to Sunbelt Cranes.  (VII, P. 84, L. 17-20.)  The job tickets not only affect income, they also affect expense, as they are the basis for paying the crane operators.  (VII, P. 85, L. 1-6, and L. 14-19.)

## Schedule

99. Dispatchers also keep the schedule, which is referred to as the "Bible" for a crane company. (VII, P. 85, L. 20-25. See also VII, P. 89, L. 23.) The crane company cannot operate without the schedule. (VII, P. 86, L. 6-9.)

## Evaluating Other Employees

100. Mr. McDonald testified that the Plaintiff had no involvement in setting pay. (VII, P. 69, L. 7.)

101. Contrary to the Plaintiff's testimony, the Plaintiff's own witness, Mitch McDonald, testified that when he was considering giving an operator a raise, that he would talk to the Plaintiff and request his input on how the operator was doing with attendance, how they were doing, and whether there were any complaints from customers. (VII, P. 69, 11-16. See also VII, P. 71, L. 18-21.) Mr. McDonald also testified to conferring with the Plaintiff in giving raises to oilers. (VII, P. 100, L. 12-18.) He admitted that he gave weight to the Plaintiff's statements regarding performance of an operator or oiler. (VII, P. 100, L. 21-24. See also VII, P. 101, L. 5-7.) He testified that the Plaintiff saw these employees day-to-day, and attitude was important. (VII, P. 101, L. 1-4. See also VII, P. 114, L. 1-7.)

## Hiring/Firing Authority

102.     Mr. McDonald testified that the Plaintiff had no involvement in hiring and firing workers.  (VII, P. 69, L. 1-2.  See also VII, P. 71, L. 24 – P. 72, L. 2.)

## Current Employment

103.     Mr. McDonald resigned from Sunbelt Cranes in October 2007, approximately three months after Ray Anthony purchased the company.  (VII, P. 104, L. 19-23.)  Mr. McDonald is now the general manager for All Crane, which is a competitor with Sunbelt Cranes.  (VII, P. 105, L. 18-24.)

104.     Mr. McDonald testified that the Plaintiff asked him to be a witness, but did not discuss his claims against Sunbelt Cranes.  He did tell him that it was over the overtime.  (VII, P. 107, L. 4-10.)

## TESTIMONY OF PATRICK GUNN

105.     The Defendant presented the testimony of Patrick Gunn.  Mr. Gunn is currently a dispatcher for Ray Anthony, International.  (VII, P. 155, L. 19.)  He is currently employed by the Sunbelt Cranes division.  (VII, P. 156, L. 9.)  He started in the crane rental business when he was 16 years old. (VII, P. 156, L. 13-19.)  He became a dispatcher in 1998.  (VII, P. 157, L. 4-5.)

106.    Mr. Gunn testified that the dispatcher works from an office, and that his duties are non manual.  (VII, P. 220, L. 16-22.)

107.    Mr. Gunn testified that his duties as a dispatcher included overseeing all the operators, truck drivers, riggers, and erection crew.  To make sure they get out of the yard on time n the mornings and get to the job sites on time.  (VII, P. 157, L. 10-13.)   He also reviews job tickets, reviews timesheets and turns them into the billing department.  (VII, P. 158, L. 1-11.)  He directs the operators, truck drivers, riggers, oilers and erection crew.  (VII, P. 158, L. 19-20.)  He also directs the shop depending on what is in the shop. (VII, P. 158, L. 22-23.)

108.    Mr. Gunn testified that he calls the crews in the evening to make sure they have all equipment for the next day's jobs.  He also follows up with them during the day to make sure they doing the job. (VII, P. 159, L. 2-11.)

109.    Mr. Gunn has received annual bonuses while working for Ray Anthony, International.  (VII, P. 226, L. 13-18.)

## Hours

110.    Mr. Gunn testified that he works Monday trough Friday 6:30 to 6:30, and Saturday 7:00 to 3:00.  (VII, P. 157, L. 17-18.)

## Customer Communication

111.     Mr. Gunn testified that the dispatcher also handles telephone calls from customers, including orders, and takes calls from other branches that need equipment.  (VII, P. 176, L. 6-8, and L. 13-14.)

112.     The dispatcher is the primary contact for customers.  (VII, P. 183, L. 2. See also VII, P. 182, L. 12-15.)

## Selecting Cranes and Charting

113.     In determining the crane for a job, the dispatcher needs to know weight, radius, height, ground conditions, power lines, and trees.  (VII, P. 177, L. 24-25.)

114.     There is nothing on the load charts talks about ground conditions or curbing locations.  (VII, P. 178, L. 7-9, and L. 15-18.)  He testified that he knows the questions to ask the customers based on his experience. (VII, P. 178, L. 25 – P. 179, L. 2.)

115.     Mr. Gunn testified that dispatching cranes is different than other rental companies, due to the size of the equipment involved, the people involved and moving the equipment.  (VII, P. 180, L. 8-18.)

116.     Mr. Gunn testified that while most operators have assigned cranes, if operators have to be moved to a crane, it is based on their abilities.  (VII, P. 159, L. 18-23.)

117.     Mr. Gunn testified that the crawler and rough terrain (R/T) cranes do not always have assigned operators.  In that instance the dispatcher may hire someone or put one of their other operators on the machine.  (VII, P. 170, L. 13-17.  See also VII, P. 174, L. 11-13.)

118.     When asked what role seniority had in pairing an operator with a piece of equipment, Mr. Gunn testified that it played: "Very little.  Only if they're able to run their equipment."  (VII, P. 171, L. 5-8.)  He further testified: "You just got to know the operator to make sure they know what they're doing."  (VII, P. 171, L. 12-14.)

119.     Mr. Gunn testified that selecting an operator was not just a matter of choosing the equipment based on the charts.   Rather, he had to exercise independent judgment based on the job and his knowledge of operators when there would be more than two machines of the same size.  He might have one operator who could do the job better than the other.  (VII, P. 216, L. 11-15.)

## Overseeing Other Employees

120.　　Mr. Gunn testified that the dispatcher is the superior to the operators. The operators take their directions from the dispatcher and report to the dispatcher. (VII, P. 161, L. 11-23.)

121.　　Mr. Gunn testified that the dispatcher also directs the oilers, and that the oilers and dispatchers must obey his direction. (VII, P. 162, L. 19 – P. 163, L. 2.) Likewise the dispatcher directs the riggers and the erection crews. (VII, P. 163, L. 5-13, and L. 14-19.)

122.　　Mr. Gunn testified that he also oversees the 10 employees in the yard, and that they are not free to disobey his direction. (VII, P. 164, L. 6-23.)

123.　　Mr. Gunn testified that his supervising duties also included checking the time on job tickets, talking to customers, quoting jobs, and doing proposals and contracts. (VII, P. 165, L. 6-8.)

124.　　Mr. Gunn testified that if an operator is in an accident or has a breakdown, they report directly to the dispatcher. The dispatcher then sends the right people to the site for an accident investigation, or in the case of a breakdown had the shop send a mechanic. He may also send another piece of equipment. (VII, P. 169, L. 5-10, and L. 19-24.)

125.     Mr. Gunn testified that the dispatcher speaks on a daily basis with the shop foreman on what equipment is in the shop, how it is progressing and whether it will be available for jobs.  (VII, P. 218, L. 19 – P. 219, L. 4.)  He can direct personnel in the shop to work on a particular piece of equipment if it is needed for a job.  (VII, P. 219, L. 7-9.)

## Pricing Authority

126.     Mr. Gunn testified that when he quotes prices to customers, there is a standard price sheet to follow.  However, the dispatcher can lower that some if in their judgment it is needed.  (VII, P. 186, L. 2-5, and L. 17-19.)  Longer term jobs and repeat customers receive consideration on price breaks.  (VII, P. 187, L. 10-14, and L. 18-20.)

## Job Tickets

127.     Mr. Gunn testified that the operators turn in their job tickets to him.  (VII, P. 165, L. 11-13.)

128.     Mr. Gunn testified that the dispatcher puts information on the job tickets that tells the operators where to go, gives them directions to get there, and what the job is.  (VII, P. 166, L. 15-18.)

129.     When the job tickets are turned in the dispatcher verifies the information on the job ticket to the job write up and then turns it into billing. (VII, P. 167, L. 3-5.) He verifies the hours and the hourly rate for the crane. (VII, P. 167, L. 16-17.) If the operator makes a mistake on the job ticket, or if there is too much travel time, the dispatcher adjusts the time out before turning it into billing. (VII, P. 168, L. 1-5. See also VII, P. 221, L. 20 – P. 222, L. 1, and VII, P. 223 L. 19 – P. 224, L. 1.) He may also make an adjustment if a customer calls in with a complaint, such as if a crane broke down. VII, P. 168, L. 17-21.)

## Schedule

130.     Mr. Gunn also testified that the dispatcher is responsible for preparing the schedule, without which the crane company would not run. (VII, P. 189, L. 10-16. See also VII, P. 221, L. 2-7.)

## Substituting and Calling for Cranes

131.     Mr. Gunn testified that if the branch he is at does not have a needed piece of equipment, he can call other branches to try to locate the equipment. (VII, P. 189, L. 22 – P. 190, L. 2.)

## Evaluating Other Employees

132.     Mr. Gunn testifies that when the general manager is considering pay raises, that he sits down with the general manager and goes over the list and reviews how the person is performing.  (VII, P. 175, L. 21-24.)

<u>Hiring/Firing Authority</u>

133.     Mr. Gunn testified that if he needs an operator he can hire from the union hall of someone who has submitted an application.  (VII, P. 171, L. 25 – P. 172, L. 3.)  He has hired approximately 50 operators as a dispatcher.  (VII, P. 172, L. 4-8.)  When he hires, he also negotiates the wage.  (VII, P. 183, L. 16-23.)  He also hires truck drivers, riggers, oilers and erection crew.  (VII, P. 185, L. 7-8.)

134.     Mr. Gunn also testified that he has the authority to fire employees, and that he had actually laid off an operator the day he testified.  He did not require approval to do so. (VII, P. 172, L. 13-21.  As to his employment while at Sparks Cranes as well as Ray Anthony, International, see also VII, P. 227, L. 18-23.)  He has terminated about the same number of employees as he has hired.  (VII, P. 172, L. 22-25.)  Factors that he considers in firing an employee include not doing what the dispatcher tells him to do and not showing up for work.  (VII, P. 175, L. 5-7. See also VII, P. 205, L. 16-18.)  When he lays off an employee for lack of work, that determination is made by him.  (VII, P. 206, L. 6-9.)

135.    Mr. Gunn testified that when he would hire or fire someone while with Ray Anthony, International, that there was paperwork to fill out.  (VII, P. 195, L. 18-24.  See also VII, P. 196, 23 – P. 197, L. 1 and P. 197, L. 7-13.)  When he was at Sparks Crane he had the authority to hire and fire, and some of the 50 people he testified to hiring and firing were while he was at Sparks Crane.  However, when he was at Sparks Crane, the office manager took care of the paperwork.  (VII, P. 196, L. 4-14.)

136.    Mr. Gunn testified under cross-examination that he previously worked at Sparks Crane Services, which was acquired by Ray Anthony International in May 2005.  (VII, P. 192, L. 9-14.)

137.    Mr. Gunn testified that the duties he had performed at the Tampa branch were identical to the duties at the Pinellas Park branch. (VII, P. 211, L. 20-25.)

138.    Mr.  Gunn testified that the dispatcher duties he described have been the same for the past 11 years.  (VII, P. 163, L. 23 – P. 164, L. 1.)

**TESTIMONY OF RICHARD FERCHAK**

139.    The Defendant presented the testimony of Richard Ferchak.  Mr. Ferchak is the chief operating officer with Sunbelt Cranes.  (VII, P. 234, L. 22.)  He has been the chief operating officer since July 2007.  (VII, P. 235,  11.)

140.    Mr. Ferchak has been in the crane business since 1985, having worked for four different crane rental companies in that time. (VII, P. 234, L. 25 – P. 235, L. 3.) The four companies he has worked for are Anthony Crane Rental, Baldwin's Crane Service, Maximum Crane Works and Ray Anthony, International. (VII, P. 272, L. 16-19.) He has held positions of laborer, operator, truck driver, shop helper, dispatcher, branch manager, regional manager, chief operating officer and chief executive officer. (VII, P. 235, 6-8.)

141.    Mr. Ferchak identified the chain of command as being the owner, Mr. Anthony, himself as chief operating officer, the branch manager, and then the dispatcher. (VII, P. 236, L. 23 – P. 237, L. 2.)

142.    Mr. Ferchak testified that the position of dispatcher is important because everything goes through dispatch. (VII, P. 237, L. 5.) As he described it:

143.    Every crane that leaves the yard has to go through dispatch. Every oprator that leaves the yard has to go through dispatch. Every timesheet that's turned in goes through dispatch. Every DOT log that goes – that comes in goes through dispatch. Every write-up that is done that verifies what crane goes out, what the pricing on it is, goes through dispatch.

144.     The job tickets leave through dispatch and come back through dispatch. If there's a breakdown, dispatcher gets called. If there's an accident, the dispatcher gets called. The dispatcher is the key role in our position. (VII, P. 237, L. 8-20.)

145.     Mr. Ferchak testified that prior experience in a crane rental company is helpful in fulfilling the job of dispatcher, knowing what it takes to get the job done. (VII, P. 239, L. 19 – P. 240, L. 5.) The dispatcher needs to understand what rigging is, what spreader bars, chokers, and shackles are, in order to dispatch them. (VII, P. 240, L. 11-15.) The dispatcher needs to know that the oiler assists the operator and takes the counterweights to the job, that he cleans and oils the crane. (VII, P. 240, L. 16-24.)

146.     Mr. Ferchak also testified that the dispatcher needs to know the ability of the operator. (VII, P. 241, L. 6-8.) Mr. Ferchak testified that without prior experience in crane operations, a dispatcher could not perform their job. (VII, P. 241, L. 15-16.)

147.     Mr. Ferchak described the duties of crane operator as making sure the workers get out on time in the morning, gathering the tickets from the prior day, verifying them and then turning them into billing. The dispatcher would also take calls from operators and customers, answer billing department questions, and if there was a problem with a write-up, deal with payroll issues. He would also

work on the following day's schedule. Mr. Ferchak testified that everything is on the schedule. (VII, P. 242, L. 18 – P.243, L. 21.) The dispatcher had to make sure the right people were with the right cranes and make sure that the job tickets matched the work orders. (VII, P. 243, L. 21 – 24.) If a crane broke down, the dispatcher had to talk to the service manager about when it would be ready. (VII, P. 244, L. 1-5.)

148.    Mr. Ferchak testified that the Plaintiff also purchased permits from the Federal DOT and the State of Florida that allowed the cranes and trucks to be moved over the road. (VII, P. 300, L. 15-21.) This involved filling out paperwork. (VII, P. 301, L. 8-9 and L. 17-19.) They were paid for through an account that the company had with the DOT. (VII, P. 312, L. 14.)

## Customer Communications

149.    Mr. Ferchak testified that as a dispatcher the Plaintiff was the first point of contact with customers. (VII, P. 246, L. 2-4.) He would answer questions and send out cranes based on his own judgment. (VII, P. 246, L. 18-21.)

## Selecting Cranes and Charting

150.    Contrary to the Plaintiff's testimony as to the length of the charts, Mr. Ferchak testified that some charts can be as long as 900 pages. (VII, P. 247, L. 1-6.)

151.    Mr. Ferchak testified that ground conditions, curbs, building size and power lines that come into play. (VII, P. 248, L. 14-19.) Those conditions on the job sites and having been there as a rigger, as Plaintiff was, tells the dispatcher what to look for, and that this is something that cannot just be taught. (VII, P. 249, L. 3-9.)

152.    Mr. Ferchak went into further detail regarding ground conditions. He testified that there is soft soil, sandy soil, hard soil and pavement. With pavement, if it is very hot, the equipment can cause ruts. (VII, P. 249, L. 15 – P. 250, L. 3.)

153.    Mr. Ferchak testified that the dispatcher exercises independent judgment in picking the correct crane for the job, selecting the operator, finding a substitute crane and pricing. (VII, P. 251, L. 4-9.) He testified that these change every day:

154.    You know, you may pick up one air conditioner and you may pick up a thousand air conditioners. But each – you don't put the same air conditioner on the same house every day. Every job is different. This is when a dispatcher's judgment comes into play. (VII, P. 251, L. 13-18.)

155.    In addition to dispatching cranes, Mr. Ferchak testified that the Plaintiff also dispatched trucks, riggers and heavy hauling for Sunbelt Cranes, Construction & Hauling, Inc.  (VII, P. 274, L. 10-12.)

156.    The different materials that may be sent with a crane include chokers, shackles, spreader bars, concrete buckets, block forks, counterweights, extra jib and boom.  (VII, P. 277, L. 9-11.)

157.    Mr. Ferchak disputed the testimony of the Plaintiff and Mr. McDonald that the plaintiff would not take calls for cranes in excess of 70 tons.

Assigning Operators

158.    Mr. Ferchak testified that if a crane operator had to be paired to a crane, it was based on ability, not seniority as the Plaintiff had testified.  (VII, P. 255, L. 19.)   Mr. Ferchak testified that just being able to run one type of crane did not mean that a person could run other, larger cranes.  (VII, P. 256, L. 4-14.)

Overseeing Other Employees

159.    Mr. Ferchak testified that the Plaintiff in his role as dispatcher would have assigned duties to the operators, the oilers, the truck drivers, the riggers and would

have worked with the service manager regarding cranes that he needed to have fixed.  (VII, P. 260, L. 14-17.  As to service department, also see VII, P. 261, L. 12-22.)  Mr. Ferchak testified that the Plaintiff assigned duties to 15 drivers, operators and riggers when Mr. Ferchak came to the company, and that by the time the Plaintiff resigned he assigned duties to 20 to 25 people.  (VII, P. 260, L. 23 – P. 261, L. 1.)

160.     Mr. Ferchak testified that if an employee disputes the amount of his pay, that while the dispatcher may not be able to resolve all disputes, it does start with the dispatcher.  (VII, P. 291, L. 22-23, and P. 292, L. 1-3.)  Only if the dispatcher cannot handle it does the dispute go to the general manager.  (VII, P. 292, L. 5-7.)

### Pricing Authority

161.     Mr. Ferchak testified that the Plaintiff had discretion in pricing cranes within a high and low range.  (VII, P. 254, L. 3-6.  See also VII, P. 280, L. 15-18.)  Repeat customers and longer term rentals received better deals.  This was within the discretion of the dispatcher. (VII, P. 254, L. 9-19.   See also VII, P. 281, L. 20-23.)

### Job Tickets

162.     Mr. Ferchak testified that the job tickets are what the company gets paid by.  (VII, P. 252, L. 17.  See also VII, P. 308, L. 20-25.)   The job tickets also control how the operators are paid.  (VII, P. 258, L. 4-10.) The dispatcher prepares the tickets.  (VII, P. 253, L. 8-9.)  When the job tickets are turned in, the dispatcher verifies them and resolves any discrepancies.  (VII, P. 258, L, 6-10.)

## Schedule

163.     Mr. Ferchak testified that the Plaintiff prepared the schedule, which showed customers, job locations, crane assignments, the operators, the length of the job and what attachments go out with the crane.  It also shows bare rentals. (VII, P. 258, L. 15-23.)  Mr. Ferchak relies on the schedule, as does the billing clerk, the payroll clerk, the employee who handles the DOT filing, the owner, and the accountants.  (VII, P. 259, L. 25 – P. 260, L. 6.)  The schedule would also be referred to for payroll issues if an operator turned in a timesheet and there was no corresponding job ticket, or if the ticket was unsigned.  (VII, P. 308, L. 11-17.)

## Hiring/Firing Authority

164.     Mr. Ferchak also confirmed the testimony of Mr. Gunn that the dispatchers were permitted to hire crane operators.  (VII, P. 255, L. 6-7.  See also VII, P. 282, L. 3-5, and VII, P. 307, L. 18-19.)   As Mr. Ferchak explained, he was not always there to be able to hire employees.  (VII, P. 311, L. 4-7.)

165.     Mr. Ferchak also testified that the dispatcher had the power to fire employees.  (VII, P. 307, L. 22-23.  See also VII, P. 310, L. 13-15.)

166.     Mr. Ferchak testified that in considering whether an employee should be hourly or salary, that Sunbelt Cranes considered the job duties.  (VII, P. 262, L. 5-8.)  In making the determination Mr. Ferchak consults with the human resources department.  (VII, P. 263, L. 2-10.)

167.     Mr. Ferchak testified that the dispatcher and the manager have key roles.  They deal with the customers and make sure the hourly employees are doing their jobs.  They work when they need to work.  (VII, P. 262, L. 19 – P. 263, L. 1.)

168.     Mr. Ferchak testified that when he was a dispatcher, he would check to make sure that his pay was in line with other crane companies.  (VII, P. 245, L. 7-12.)  Now he checks with other crane owners and managers to be sure that the company is in line so they can retain people.  (VII, P. 245, L. 13 – P. 246, L. 1.)

**Other Crane Company Dispatchers Are Salary**

169.     Mr. McDonald, the Plaintiff's own witness, admitted that dispatchers at All Crane, the company where he and the Plaintiff now work, also pays

dispatchers as salary positions with year-end bonuses, and no overtime, just as Sunbelt Cranes had done with Plaintiff.  (VII, P. 98, L. 7-12.)

170.    Mr. Gunn testified that when he was working at Sparks Cranes, that he was also paid salary without overtime and without bonuses.  (VII, P. 225, L. 14-24.)

171.    Mr. Ferchak was a dispatcher himself for five years, his salaries were similar to how he described the Plaintiff's, and he was also paid a salary, working seventy (70) hours a week without overtime.  (VII, P. 244, L. 10-24.)

172.    Mr. Ferchak testified that based upon his 24 years experience in the crane renal industry, paying the dispatcher a salary was the normal practice.  (VII, P. 245, L. 3.)

173.    The evidence presented, from both the Plaintiff's witness as well as the witnesses of the Defendant is that the standard and custom in the crane rental industry is for dispatchers to be salary.

## Credibility of Witnesses

174.    The Plaintiff testified that he had no involvement at all with the evaluation of other employees.  (VI, P. 32, L. 17-24.)

175.     Contrary to the Plaintiff's testimony, the Plaintiff's own witness, Mitch McDonald, testified that when he was considering giving an operator a raise, that he would talk to the Plaintiff and request his input on how the operator was doing with attendance, how they were doing, and whether there were any complaints from customers.  (VII, P. 69, 11-16.   See also VII, P. 71, L. 18-21.)   Mr. McDonald also testified to conferring with the Plaintiff in giving raises to oilers. (VII, P. 100, L. 12-18.)   He admitted that he gave weight to the Plaintiff's statements regarding performance of an operator or oiler.  (VII, P. 100, L. 21-24. See also VII, P. 101, L. 5-7.)   He testified that the Plaintiff saw these employees day-to-day, and attitude was important.  (VII, P. 101, L. 1-4.   See also VII, P. 114, L. 1-7.)

176.     The Plaintiff testified that his training for the dispatcher job only took one day.  (VII, P. 52, L. 5-12.)

177.     Contrary to the Plaintiff's testimony that training was completed in one day, Mr. McDonald testified that he spent most of his mornings and afternoons with the Plaintiff, and that there would also be telephone calls back and forth. (VII, P. 98, L. 20 – P. 99, L. 2.  See also VII, P. 90, L. 15-18.)   Mr. McDonald specifically denied that the training was completed in one day.   Rather he characterized it as a "…pretty long process with the chart reading and radiuses and all that kind of stuff."  (VII, P. 99, L. 6-8.)  He also had to teach the Plaintiff

about jib offsets, which have different degree offsets.  (VII, P. 120, L. 21 – P. 121, L. 2.)

178.      The Plaintiff testified that he had no authority to hire employees.  (VI, P. 30, L. 11.)  Yet the Plaintiff also testified that he did not question Jeff Fulton's authority to hire him, and he believed Mr. Fulton to be a dispatcher. (VI, P. 84, L. 21-25.  See also VI, P. 189, L. 16-18.)  That tends to undermine Plaintiff's credibility as to whether he had authority to hire.

179.      The Plaintiff testified that the chart book (with only seven charts of 10 to 15 pages each as he testified) was three to four inches thick.  (VI, P. 62, L. 3-5.)  That thickness contradicts the simplicity which Plaintiff attempts to attribute to the charts.  It supports the testimony of Mr. Ferchak that some charts can be much larger than Plaintiff testified.   (VII, P. 247, L. 1-6.)

180.      The contradictions between the Plaintiff's testimony and that of his own witness undermine his credibility.

181.      The undisputed facts are that the dispatcher was the first and often primary customer contact and could handle at least some of the customer complaints without the general manager; selected cranes to at least 70 tons based on information learned from customers through questioning that was aided by the dispatcher's knowledge and experience; oversaw and directed other employees;

prepared the job tickets; kept the schedule which was critical to the company; could substitute a different size crane for a job if required, and could obtain an appropriate crane from another branch if required.

182.    There is also no dispute that the selection of the crane required considering information that was not reflected in the charts.

183.    In performing the above functions, the dispatcher exercised independent judgment.

184.    The Defendant has presented substantial, credible evidence that the dispatcher had the authority to adjust prices based on factors such as term of the lease and repeat customer retention.

185.    The Defendant has presented substantial, credible evidence that the dispatcher had the authority to hire and fire.

186.    The Defendant has presented substantial, credible evidence, including the Plaintiff's own witness, that the dispatcher evaluated other employees.

## Attorneys' Fees

187.    Plaintiff's fee arrangement with his attorneys is that if does not win his case, he does not have to pay a fee. To date he has not paid anything to his

attorneys.  (VI, P. 193, L. 12-25.   See also VI, P. 194, L. 7, and L. 13-15; P. 194, L. 24 – P. 195, L. 1.)

188.    Plaintiff testified that if he lost, he would not owe attorney's fees.  (VI, P. 194, L. 13-16.   He testified that there was a percentage fee if he won, but he did not know the percentage.  (VI, P. 195, L. 22 – P.196, L.3.)

189.    The type of attorney fee arrangement described by the Plaintiff is known as a contingent fee arrangement.

190.    Florida Rule of Professional Conduct 4-1.5(f) require a contingent fee agreement to be in writing, and to contain certain statements regarding the client's rights.

191.    Plaintiff did not offer the fee agreement as an exhibit.

192.    Fed. Rule of Evid. 1002 requires that proving the contents of a writing requires producing the original document, or a copy thereof pursuant to Fed. Rule of Evid. 1003.

193.    Fed. Rule of Evid. 1004 permits testimony concerning the contents of a document in lieu of submission of the document in specific circumstances, none of which have been established in this case.

194.    Plaintiff has failed to provide any competent evidence regarding attorney's fees or the right to attorneys' fees.

## CONCLUSIONS OF LAW

1.    Section 207 of Title 29 of the United States Code provides in pertinent part as follows:

> (a)(1) Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

2.    Section 213(a)(1) provides that the provisions of Section 207 shall not apply with respect to any employee employed in a bona fide executive, administrative or professional capacity.

3.    The majority of courts which have analyzed the duties of a dispatcher have concluded that such position constitutes employment in a bona fide administrative or professional capacity and is therefore exempt from the overtime provisions of the FLSA. *Iaria v. Metro Fuel Oil Corp.*, 2009 WL 222373 * 3 (E.D.N.Y. 2009) (acknowledging overwhelming weight of authority); *Perine v. ABF Freight Systems, Inc.*, 457 F. Supp. 2d 1004 (C.D. Cal. 2006) (applying California law equivalent of FLSA); *LaPoint v. CRST Intern., Inc.*, 2004 WL 3105950 * 9 (N.D. Iowa 2004) (fleet manager dispatcher was employed in a bona fide administrative capacity and was therefore exempt from the overtime provisions of the FLSA); *Freeman v. Corporate Express Delivery Systems, Inc.*,

1999 WL 1012331 (N.D. Cal. 1999) (lead dispatcher having frequent interaction with customers was employed in a bona fide administrative capacity and was therefore exempt from the overtime provisions of the FLSA); *Donovan v. Flowers Marine, Inc.*, 545 F. Supp. 991 (E.D. La. 1982); *Mooney v. Preston Trucking Co.*, 215 F. Supp. 568, 572 (D.N.J. 1963) (radio dispatcher employed in a bona fide executive and/or administrative capacity and therefore exempt from the overtime provisions of the FLSA); *Harrison v. Preston Trucking Co.*, 201 F. Supp. 654 (D. Md. 1962) (dispatcher for interstate trucking company was employed in a bona fide administrative capacity and was therefore exempt from the overtime provisions of the FLSA); *Goldberg v. Arkansas Best Freight System, Inc.*, 206 F. Supp. 828 (W.D. Ark. 1962) (city dispatchers were employed in a bona fide administrative capacity and were therefore exempt from the overtime provisions of the FLSA); *Mitchell v. Branch Motor Express Co.*, 168 F. Supp. 72, 74 - 75 (E.D. Pa. 1958) (trucking company dispatchers were employed in a bona fide executive or administrative capacity and were therefore exempt from the overtime provisions of the FLSA); and *McComb v. New York & New Brunswick Auto Exp. Co., Inc.*, 95 F. Supp. 636, 641 (D.N.J. 1950) (dispatchers employed by trucking company were employed in a bona fide administrative capacity and were therefore exempt from the overtime provisions of the FLSA).

4.      Under the FLSA, the Secretary of Labor is given authority to promulgate regulations under Section 213 and has exercised such authority.  The general rule for employment in a bona fide executive capacity is located at 29 C.F.R. § 541.100 and provides as follows:

> (a) The term "employee employed in a bona fide executive capacity" in section 13(a)(1) of the Act shall mean any employee:

(1) Compensated on a salary basis at a rate of not less than $455 per week (or $380 per week, if employed in American Samoa by employers other than the Federal Government), exclusive of board, lodging or other facilities;

(2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

(3) Who customarily and regularly directs the work of two or more other employees; and

(4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

5.      The general rule for employment in a bona fide administrative capacity is located at 29 C.F.R. § 541.200 and provides as follows:

(a) The term "employee employed in a bona fide administrative capacity" in section 13(a)(1) of the Act shall mean any employee:

(1) Compensated on a salary or fee basis at a rate of not less than $455 per week (or $380 per week, if employed in American Samoa by employers other than the Federal Government), exclusive of board, lodging or other facilities;

(2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and

(3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

6.      The administrative body charged with enforcement of the FLSA, (the Wage and Hour Division of the United States Department of Labor), has stated that dispatchers may

be covered by the foregoing exemptions and, if so, would be exempt from the overtime provisions of the FLSA.

7.      With respect to the general rule exempting employees employed in a bona fide executive capacity, the DoL Field Operations Handbook states as follows at Section 22d03:

> When making a determination of the status of dispatchers employed by bus companies and trucking concerns, Reg. 541.105(b) and 541.107 should be considered.  It may be that the dispatcher has as his primary duty the routing of drivers and trucks as a routine duty performed for the executive who is actually managing the department.  It is possible, however, for a dispatcher to be exempt as an executive employee where the facts show that his primary duty is the management of the terminal or a subdivision thereof and he meets all other requirements of Reg. 541.1.

8.      With respect to the general rule exempting employees employed in a bona fide administrative capacity, the DoL Field Operations Handbook states as follows at Section 22d04:

> (a)      As pointed out in Reg. 541.207(c), the exercise of discretion and independent judgment is different from the application of skills and procedures.   Dispatchers who apply their knowledge in following prescribed procedures and techniques are not exercising discretion and independent judgment within the meaning of the Reg.  The exempt status of individual dispatchers will depend upon the facts of each case.  In this connection, the possible application of the upset-salary rule should not be overlooked.

> (b)      Truck dispatchers' duties of routing trucks and assigning drivers are, for the most part, dependent upon their knowledge of types of trucks required for various kinds of goods, their knowledge o the city and suburbs, and their knowledge of the locations of various factories and buildings.   Such duties do not ordinarily involve discretion and independent judgment at the level contemplated by the Reg.  However, where the company does not operate over regular routes, or where there is a choice between using the company's own trucks or a contract carrier's

trucks or where dispatchers handle emergency situations, there may be the exercise of discretion and independent judgment.

(c)     Bus dispatchers' duties ordinarily include assigning drivers and routing buses over predetermined routes, calling out bus arrivals and departures, furnishing information to bus passengers, collecting and recording cash fares turned in by bus drivers, and maintaining and filling out various detailed forms and records.  This work consists of the application of skills and procedures based upon the dispatchers' knowledge gained by experience and reference to routes assigned by the various public utility commissions.  They also determine the need for extra buses, decide whether to cancel runs and take actions on accident reports. The latter duties may on certain occasions require the use of discretion and independent judgment but such occasions ordinarily arise only infrequently.  Typically, bus dispatchers performing the above duties do not qualify for exemption as administrative employees.

9.     Defendant maintains that the Plaintiff exercised discretion and independent judgment in fulfilling the following, as well as other, duties:

(i)     serving as the initial and primary contact for customers;

(ii)     selecting one or more of several suitable cranes for the customer's needs;

(iii)     selecting the equipment to be utilized with the cranes on projects;

(iv)     selecting the operator for the cranes and heavy equipment to be utilized on projects;

(v)     keeping the schedule of operators, cranes and heavy equipment;

(vi)     coordinating with the shop foreman and ensuring the availability of the cranes and heavy equipment for projects;

(vii)     managing the operators, oiler, riggers, and drivers for Defendant's operations;

(viii)     giving employee evaluations in connection with pay raises and/or promotions;

(ix)    hiring and firing employees.

10.    Based upon the facts established at trial, case law, regulations, and interpretations, this Court should properly consider the Plaintiff to be employed in a bona fide executive and/or administrative capacity and therefore exempt from the overtime provisions of the FLSA.

11.    All wage and compensation-related decisions made with respect to the Plaintiff were made in good faith and that the Defendant had reasonable grounds to believe that it was operating in full compliance with all regulations, statutes, and administrative rulings.

12.    If an employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that it had reasonable grounds for believing that its action or omission was not a violation of the Fair Labor Standards Act, the court may, in its sound discretion, refuse to award liquidated damages. *See* Section 260 and *Cross v. Arkansas Forestry Com'n*, 938 F.2d 912, 917 (8th Cir. 1991) (the FLSA provides for an award of liquidated damages to an employee to remedy an employer's violation of the FLSA. However, the trial court has discretion not to award liquidated damages if the employer demonstrates that the violation was in good faith and objectively reasonable).

13.    The Plaintiff has failed to prove entitlement to attorney's fees.

## Conclusion

For the foregoing reasons, the Defendant respectfully requests this Honorable Court to find that the Plaintiff was employed in a bona fide executive and/or administrative capacity and was therefore exempt from the overtime provisions of the FLSA, enter judgment in the Defendant's favor, and awarding the Defendant its reasonable attorneys' fees and court costs for the defense of this action.

Respectfully submitted,

/s/Mark A. Rowan
Mark A. Rowan
Attorney for the Defendant

890 Vanderbilt Road
Connellsville, PA  15425
Telephone: (724) 628-8180
Telecopier: (724) 628-8189


Florida Bar No. 524761

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing Defendant's Trial Brief has been furnished by the Court's CM/ECF System to MATTHEW DAVID WESTERMAN, ESQ., Shankman, Leone & Westerman, P.A., 609 East Jackson Street, Tampa, Florida 33602, on the 14th day of August, 2009.

By:/s/ Mark A. Rowan
       Mark A. Rowan
       Attorney for Defendant